## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RANDALL MORGAN,                    :

      Plaintiff,                :        Case No. 3:12cv00126

 vs.                               :        District Judge Walter Herbert Rice
                                            Chief Magistrate Judge Sharon L. Ovington
CAROLYN W. COLVIN,                 :
Acting Commissioner of
Social Security,                   :

      Defendant.                :

===============================================

## REPORT AND RECOMMENDATIONS[1]

===============================================

## I.    INTRODUCTION

Plaintiff Randall Morgan brings this case challenging the decision of the Social

Security Administration denying his application for Disability Insurance Benefits (DIB).

Plaintiff applied for DIB in August 2004, alleging that he had been disabled since

February 2003.  (Tr. 59).  He listed his disabling condition as "fibromyalgia and hip going

out of place, pain throughout."  (Tr. 67).  Approximately two weeks after filing his

application, Plaintiff was severely injured in an auto accident, sustaining fractures in his

right leg and spine.

Considering all of the above conditions, the Administration denied Plaintiff's claim,

initially and upon reconsideration.  (Tr. 38, 42.)  After a hearing in 2007, Administrative

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Law Judge (ALJ) Daniel Shell found that Plaintiff was not disabled, and the Administration declined review.  (Tr. 30-32, 5-7).  On appeal pursuant to 42 U.S.C. § 405(g), United States Magistrate Judge Michael R. Merz recommended remand of Plaintiff's case, and United States District Judge Walter Herbert Rice adopted the recommendation.  (Tr. 432-43).

After a new hearing in December 2011, ALJ Thomas McNichols II also found that Plaintiff was not disabled, and the Administration again declined review.  (Tr. 412, 385).  Plaintiff now seeks this Court's review of the Administration's final decision.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), Defendant's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record, and the record as a whole.  Plaintiff requests the Court reverse the ALJ's finding that he is not disabled and award benefits.  Defendant seeks a decision affirming the Administration's denial of benefits.

## II.    BACKGROUND

### A.    <u>First Administrative Proceedings and Remand</u>

After the Administration denied Plaintiff's application, he requested a hearing to review the decision.  (Tr. 44).  He appeared before ALJ Shell in 2007, representing himself.  (Tr. 351).  ALJ Shell considered the opinions of Plaintiff's treating physician, Dr. James W. Thomson; several specializing physicians who had evaluated Plaintiff since the date of alleged disability onset; and Dr. Richard Hutson, a medical expert called by ALJ Shell to review the record.  (Tr. 20-24).  Finding that Plaintiff's "allegations of disability

are not supported by substantial objective medical evidence or clinical findings and cannot be considered credible," ALJ Shell determined that he was not disabled as defined by the Social Security Act.  (Tr. 30-32).

On appeal, Magistrate Judge Merz recommended that Plaintiff's case be remanded for rehearing, on grounds that ALJ Shell had not (1) asked Plaintiff whether the record was complete; (2) examined Plaintiff's medical treatment history in enough detail; and (3) advised Plaintiff that he had the right to cross-examine the vocational expert who testified at the hearing.  (Tr. 440-42).  District Judge Rice adopted the recommendation.  (Tr. 43).

### B.  Plaintiff's Vocational Profile and Disability Claims

Plaintiff was born in 1962, and has attained an educational level equivalent to high school but has no vocational training.  (Tr. 846, 848).  He claims he last worked in November of 2003 at Union City Body Co., a car factory, where he "painted . . . and assembled trash trucks."[2]  (Tr. 93, 101, 352-53).  Before that, he worked at Alcom Plastics, where he was a general laborer.  (*Id*.)  His last day of work there was February 18, 2003, which is also the onset date of his alleged disability.  (Tr. 93, 59).  In prior years, Plaintiff similarly worked as a laborer at various factories.  (Tr. 101).

At the 2011 hearing before ALJ McNichols, vocational expert Vanessa Harris testified that:

---

[2] The record is not entirely clear regarding Plaintiff's last employment.  In 2011, he testified that he last worked "for a company by the name of Auto Car in Hagerstown, Indiana.  And we assembled trash trucks."  (Tr. 849).  But on the Work Activity Report Morgan submitted as part of his DIB application in 2004, he listed his last employer as Union City Body Co. and said he could only work there for three weeks.  (Tr. 93).  During his 2007 testimony, he remembered working there for six months before being laid off around December.  (Tr. 353).

> this gentleman has worked as a door machine operator, . . . exertional level medium, skill level 3, semiskilled; assembler, motor vehicle, . . . exertional level medium, skill level 2, unskilled; spot welder, . . . exertional level medium, skill level 2, unskilled; he also worked as a crate builder, where he was building skids, . . . exertional level medium, skill level 3, semiskilled.

(Tr. 867).

Plaintiff's disability claim is largely based on medical problems stemming from a motor vehicle accident in August of 2004.[3] Miami Valley Medical Center records from that incident indicate that he was an unrestrained passenger thrown from a pickup truck. (Tr. 163). His hospital admission report details his injuries:

> The patient was found to have a grade 2 open right pylon fracture as well as multiple ipsilateral foot injuries. He had soft compartments and an intact but diminished motor examination. The patient was cleared for surgery by the trauma surgery service and was then taken to surgery where he underwent irrigation and debridement of the right open pylon fracture as well as application of the uniplaner external fixator, wound VAC application, and removal of cortical bone spike from the right mid foot.

(Tr. 163). Plaintiff's spinal x-rays "demonstrate[d] an L2 burst fracture with an approximately 15-20% loss of height. . . . There does appear to be a three column injury pattern." (Tr. 167).

In his own testimony before ALJ McNichols, Plaintiff said he was prevented from working in any job by pain in his leg and back, and by depression. Shortly before that hearing, he underwent a medical examination of his right foot. The results, he explained, revealed that:

---

[3] Plaintiff filed his initial DIB claim before the accident, but the severe and persistent injuries it caused have overshadowed his original health problems.

4

> It has multiple breaks all the way through it.  The foot is actually crushed where like the toes and stuff are, it's crushed.  The ankle has three to four breaks that you can see – I mean see all the way through.  And then the leg itself, . . . it has a break still through it that never healed.  They went in and the doctor from the University of Cincinnati . . . just said it was a mess and it is actually he had told me it's actually supposed to be non-weight-bearing, but as – you know, I mean, he said, just walk on it real easy . . . .

(Tr. 850).  Plaintiff described the continuing pain in his foot:

> Each morning when I get up out of bed, it takes me about 15 minutes to get up the nerve to step down.  It re-breaks every morning, and that – to describe that pain, I just – I can't describe it, it is just terrible.  Like I said, it takes about 15 minutes to even get up the guts to step down and then you hear it.  It, you know, just shatters.  And, of course, after that, I'm able to you know, start walking very slowly, and in a couple hours, it may even be three or four and it may not even be that day that I can get a shoe on my foot.  You know, because getting that shoe on, well, I mean – such a simple task and something easy to do, even getting that shoe on it's very painful.  And then your foot has to adjust to that shoe.

(Tr. 851-52).  Plaintiff said that his foot injuries caused him constant pain, which he rated as a "seven/eight" on a ten-point scale.  He also said he experienced severe spasms of pain that caused him embarrassment.  (Tr. 856-57).

Regarding his back, Plaintiff described constant pain that he rated as a "fiveish" on a ten-point scale when controlled by medication.  (Tr. 858).  He said his back problems forced him to "move quite a bit" and interfered with his sleep.  (*Id.*)

Finally, Plaintiff discussed his depression.  He said that "when you can't do anything, you get pretty ashamed of yourself" and "there's no way I could work."  (Tr. 855, 854).  He indicated that he had not found available free counseling to be effective, and he was managing his condition with medication.  (*Id.*)

5

Ultimately, Plaintiff said that pain was the main obstacle to his working.  (Tr. 860).
He managed his pain daily by taking two tablets each of Oxycontin and Neurontin.  (Tr.
855).  He also took Valium to help him sleep at night, Wellbutrin and Prozac to manage
his depression, another medication to prevent pancreatitis, and a final medication to
manage his diabetes.  (*Id.*)

When asked by ALJ McNichols, Plaintiff testified that without his cane, he could
stand for about five minutes and walk "very, very, very little."  (Tr. 858-59).  With his
cane, he estimated he could stand for about fifteen minutes and walk about half the length
of a city block.  (*Id.*)  He said he could sit for half an hour, and did not have trouble using
his upper extremities other than the need to hold his cane with one hand.  (Tr. 859-60).  On
examination by his attorney, he said that he could not walk on uneven ground due to the
risk of falling, which had happened to him many times.  (Tr. 864).  He told the ALJ that he
could perform basic household chores and errands, but he could not exercise and rarely
participated in social outings.  (Tr. 860-62).

### C.    Medical Source Opinions

From March to May of 2003, Plaintiff was evaluated three times by rheumatologist
Dr. Ritu Madan.  His symptoms consisted of "pain in his shoulders, hips, neck and back.
Early morning stiffness lasts for an hour and the stiffness is present all over.  His
symptoms are aggravated with changes in temperature and strenuous activity."  (Tr. 149.)
He reported improvement with high doses of ibuprofen and rest, though he had trouble
sleeping.  (*Id.*)  At the time, he denied feeling depressed, though a questionnaire score

indicated mild depression.  (*Id.*)  Dr. Madan found "degenerative arthritis in [Plaintiff's] spine" and diagnosed him with chronic pain syndrome and insomnia.  (Tr. 150, 146). Plaintiff reported that Dr. Madan's prescribed medications improved his sleep to some degree, but not his hip pain.  (Tr. 146).

In August of 2004, Plaintiff's treating physician, Dr. Thomson, referred him to Dr. Badreddine, another rheumatologist.  At that time, Plaintiff complained of persistent pain "in the joints and sometimes in the rib area and the legs with cramping," and continued troubling sleeping.  (Tr. 155).  He reported an earlier diagnosis of fibromyalgia.  Dr. Badreddine noted that Plaintiff smoked four packs of cigarettes per day and had symptoms of emphysema.  (*Id.*)  She prescribed new medications and recommended participating in a sleep study.  (Tr. 157).

Plaintiff's auto accident occurred later that month.  In addition to the operation he received on the day of the accident, he received three later surgeries to repair his right leg and foot, under the care of Dr. Ronald Lakatos.  The last two of these, on August 28 and September 9, 2004, attempted to restore Plaintiff's bone structure through the use of bone grafting and hardware installation.  (Tr. 181-88).  He was discharged from the Medical Center on September 13, 2004, after which he began a course of physical therapy.  (Tr. 186-89).

Dr. Lakatos continued to examine Plaintiff over the following months.  In October of 2004, he found the hardware in Plaintiff's ankle and foot "to be in place with no evidence of malpositioning.  The fibula appears to be healed.  The tibia shows evidence of

healing." (Tr. 304).  Plaintiff's primary complaint at that time was pain from his back

injury, which required him to wear a brace.  (*Id.*)  Dr. Lakatos reported that

> [i]n regards to his ankle and foot, we are going to have him begin light partial
> weight bearing . . . .  We discussed the fact that he is still smoking and that we are
> not out of the woods on this pilon fracture as far as healing process and he we [sic]
> may still be dealing with more problems if he is [sic] does not stop smoking.

(Tr. 305).

In December, Dr. Lakatos saw continued healing of the bones in Plaintiff's right

foot and noted neutral range of ankle motion.  (Tr. 302).  He recommended that Plaintiff

reduce his pain medications, increase weight-bearing exercises with a walker boot, and

begin other physical therapy for his back.  (Tr. 302-03).  He noted that Plaintiff was

"unfortunately still smoking . . . and we did discuss this."  (Tr. 303).

In February of 2005, Dr. Lakatos found that Plaintiff's spinal fracture was healed

and that his right leg and foot fractures were still making progress, though "some of the

fracture fragments involving the distal tibia seem to not be healed."  (Tr. 300).  He

reported that Plaintiff "does feel he is making some progress in his ambulation as he notes

he can start to make some steps with a walker around the house without the brace but

when he goes out he is still using the walker boot."  (*Id.*)

In the spring of 2006, Plaintiff was hospitalized twice.  The discharge diagnoses

from his first visit were acute pancreatitis, hyperlipidemia, essential hypertension, adult

onset diabetes mellitus, gross exogenous obesity, and alcohol habit.  (Tr. 260).  For these

conditions, he received medications and counseling on diet and exercise.  (Tr. 264).  His

medical records note that "[h]e has chronic musculoskeletal complaints and neurological complaints from his surgery such that he states that he is disabled." (Tr. 266). The reason for his second visit was "pain and swelling in his right ankle and calf." (Tr. 296). He reported that since his auto accident, his leg had "improved[]greatly however, he just developed pain recently[.]  He is able to ambulate but does so with a cane[.]  He states the pain is 'constant and shooting.'" (Tr. 296). He was prescribed pain medication and advised to visit his treating physician, Dr. Thomson, for a recheck. (Tr. 296-97).

The next record of a surgical evaluation is from May of 2006 with Dr. Matthew Lawless. Dr. Lawless reported that Plaintiff was disabled from his injury and walked with a cane. (Tr. 299). He found a "nonunion" present in the bones of his right leg, and noted that Plaintiff "smokes two packs of cigarettes a day." (*Id.*) He told Plaintiff that his nonunion indicated "removal of hardware, debridement and culture and re-fixation," but he would not perform this operation until Plaintiff stopped smoking. Dr. Lawless reported that "[a]t this point, he does not wish to proceed with any surgical intervention. We will see him back in a years' [sic] time and repeat x-rays at that point." (*Id.*)

Plaintiff next saw Dr. David K. Magnusen from July 2006 through February 2007. Dr. Magnusen's first report indicates that Plaintiff's initial surgeon, Dr. Lakatos, had moved away and that he was "in search of another physician to continue with prescribing the medications." (Tr. 336). An x-ray of Plaintiff's right foot showed that

> [m]ost of his orthopedic injuries have healed with the exception of the distal tibial fracture, which remained surgically fixated with rods and screws. . . .  His last CT reported dated May 4, 2006 mentioned numerous fracture lines remaining evident

9

in the distal tibia with some gaps between sclerotic bone.  There is no obvious malalignment or malrotation of the bony fragments.

(*Id.*)  Describing his physical condition to Dr. Magnusen, Plaintiff complained of

a constant low-grade ache across the lower back on the right.  He also reports a chronic pain and tightness in his calves; chronic pain, numbness and weakness in the right foot.  He mentions his standing tolerance is to ten minutes and sitting tolerance to twenty minutes.  He has been trying to increase his walking distance and decrease his consumption of narcotics, but has not been able to go any lower than the 20 mg of Kadian twice a day and regular strength Percocet 3 times a day.

(*Id.*)  Dr. Magnusen noted  the presence of

a well-healed scar overlying the anterior medial and lateral portions of the right foot and ankle.  There is marked atrophy of the muscles of the right foot and distal ankles.  Mr. Morgan ambulates with a straight leg cane on the right side as he says it alleviates pressure to the foot and ankle.  He has tried ambulating on the left, but it is too uncomfortable.  While ambulating, the right foot is externally rotated, but does not appear shortened. . . .  Ankle range of motion is normal on the left and markedly impaired on the right. . . .  There does appear to be a non-union of the distal tibia fracture.

(Tr. 337-38).

In January of 2007, Dr. Aivars Vitols examined Plaintiff at the request of the Ohio Bureau of Disability Determination.  Dr. Vitols found that Plaintiff "presents with a severe antalgic gait.  He favors the left lower extremity.  He is able to take a few steps without the aid of a cane."  (Tr. 314).  He also noted that Plaintiff "reveals some restricted motion within the low back and reports pain at the extreme range of motion.  He reports tenderness that is generalized throughout the low back."  (Tr. 315).  Dr. Vitols confirmed that a previous x-ray showed a "mal-aligned, non-union distal third tibial fracture, foot fracture right with chronic metatarsalgia, [and] lumbosacral sprain and strain."  (*Id.*)

10

After the examination, Dr. Vitols assessed Plaintiff's ability to perform various work-related activities.  He found that without interruption, Plaintiff could sit for two hours, stand for two hours, and walk for one hour.  In an eight-hour work day, he could sit for eight hours, and stand and walk for four hours each.  Dr. Vitols indicated that Plaintiff should never be expected to balance or climb stairs, ramps, ladders, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; and could occasionally lift up to twenty pounds and carry up to ten.  In Dr. Vitols' estimation, Plaintiff could never tolerate unprotected heights, or moving mechanical parts, but he could occasionally operate a motor vehicle and would have no problems with humidity, wetness, dust, fumes, extreme temperatures, or vibrations.  He reported that Plaintiff could walk a block at a reasonable pace on rough or uneven surfaces, and climb a few steps at a reasonable pace with the use of a single hand rail.  (Tr. 321-26).

In March of 2007, Dr. Thomson wrote a letter stating that Plaintiff was "obviously totally and permanently disabled" due to thirteen listed medical issues:

1.  Motor vehicle accident 08/17/04-multiple trauma
2.  Crushed right leg with nonhealing (nonunion) right tibia
3.  Compression fracture L5
4.  Chronic benign pain state secondary to #1, 2, & 3
5.  Narcotic dependence secondary to #1, 2, 3, & 4
6.  Insulin dependent diabetes mellitus
7.  Severe hyperlipidemia
8.  Elevated blood pressure
9.  Chronic recurrent pancreatitis
10.  Impotence secondary to all above
11.  Nicotine habit
12.  Chronic anxiety, depression
13.  Obesity with poor physical condition

(Tr. 339).

For purposes of the 2007 hearing before ALJ Shell, Dr. Richard Hutson, an orthopedic specialist, was asked to complete a medical questionnaire, based on the medical exhibits that had been entered in Plaintiff's case.  Dr. Hutson wrote that hospital records immediately following Plaintiff's auto accident in 2004 "best identifie[d] the onset of any limitation."  (Tr. 340).  In response to an interrogatory about what limitations he would put on Plaintiff if he were his patient, he answered: "He must use his cane and can do no more than <u>sedentary</u> work at this time. . . .  I feel that the patient is more limited than Dr. Vitols [indicated]."  (*Id.*) (emphasis in original).

Another interrogatory asked, "Which listing(s), if any, is/are most appropriate in considering the findings and the limitations found in this case?  Do the findings warrant an opinion that the listings are met or equaled?"  (Tr. 342).  Dr. Hutson answered that Listings 1.02 and 1.06 were most appropriate.  He wrote: "The patient is ambulating <u>fairly well</u> with his cane.  The non-union issue is not totally resolved.  He must quit smoking in order to have surgery by Dr. Lawless!"  (*Id.*) (emphasis in original).  The next question asked: "If the claimant meets or equals the Listings, please provide the earliest date, established by the medical evidence, on which the Listing was met or equaled, and what exhibit best supports the date."  (*Id.*)  Dr. Hutson answered with a horizontal strike mark. (*Id.*)

12

From 2008 to 2010, Plaintiff was evaluated four times by Dr. Craig Bierer, an orthopedist.  After the first visit, Dr. Bierer reported that

> [w]e discussed possible removal of the screw backing out of the foot.  In regards to his nonunion I would like to let sleeping dogs lie.  I discussed with him the potential complications of anything done to this region far outweighs benefits.  I believe the best thing for this right now is pain management.  If this continues to be painful or gets worse in the future we will need to consider referring him to foot and ankle specialist for possible fusion.

(Tr. 609).  At a follow-up visit, Dr. Bierer diagnosed Plaintiff with lumbar degenerative disk disease, lumbar radiculopathy–right leg, and right ankle nonunion.  (Tr. 607).  He recommended that Plaintiff should "see a foot and ankle specialist" and have an MRI done.  (*Id.*)

Dr. Bierer saw Plaintiff again in November 2010 after he had been injured in another auto accident.  Hospital records following the accident describe Plaintiff as "a restrained driver of a Ford F-150 who hit a car that pulled out in front of him."  (Tr. 715).  New x-rays showed "non-union of the distal tibia with broken hardware."  (Tr. 686).  Dr. Bierer reported that "[w]e discussed possible immobilization and non-weight bearing but he wanted to wait and avoid any use of a CAM Boot or crutches at this time.  He feels that he can get around."  (*Id.*)

Also in November 2010, the Ohio Bureau of Disability Determination asked Dr. Thomson to respond to a short questionnaire regarding Plaintiff's mental status.  (Tr. 629).  Dr. Thomson indicated that Plaintiff did not have a "history of any mental impairment," and that he had neither provided medical treatment (including prescribing medication) to

13

Plaintiff nor referred Plaintiff for such treatment elsewhere.  (*Id.*)  Finally, he indicated

that there were no "functional restrictions related directly to the mental impairment."  (*Id.*)

The following month, the Bureau referred Plaintiff to Dr. David Chiappone for a

psychological evaluation.  (Tr. 621).  Dr. Chiappone assessed Plaintiff's appearance and

behavior, flow of conversation and thought, affect and mood, anxiety, mental content,

bodily concerns, sensorium and cognitive functioning, insight and judgment, and activities

of daily living.  He concluded that

> Mr. Morgan is mildly impaired in his ability to understand, remember, and follow
> instructions. . . .  He is mildly impaired in his ability to maintain attention and
> concentration, persistence and pace to perform simple repetitive tasks. . . .  He is
> mildly impaired in his ability to relate to others, including fellow workers and
> supervisors.  He was consumed about his health problems and he would have
> difficulty dealing with give and take.  He is mildly impaired in his ability to
> withstand the stress and pressures associated with day-to-day work activity.  He is
> capable of managing funds provided he doesn't return to substance abuse.

(Tr. 625.)  Dr. Chiappone diagnosed Plaintiff with Depressive Disorder – NOS and

Personality Disorder – NOS with Cluster features.  (Tr. 626).

In September 2011 Plaintiff did ultimately undergo surgery to remove the broken

hardware in his right ankle.  (Tr. 744-45.)  He received post-surgical care at The

University Hospital Orthopaedic Outpatient Center.  Regarding his visit of October 12th,

2011, the physician's assistant report stated that "[t]here is a partially broken screw which

remains in bone.  There is still evidence of nonunion of the tibia.  Fibular plate is intact

without lucencies or hardware failure.  There is significant ankle traumatic arthritis."  (Tr.

717).  The report recommended that he wear a 3D boot to manage ankle pain.  It also

noted, "[w]e did discuss the possibility of future surgeries with respect to bone grafting, ankle fusion.  The patient understands any further procedures necessary would be imperative for him to discontinue smoking as any other procedures would certainly fail with his history."  (*Id.*)

On November 27, 2011, Dr. Thomson completed a questionnaire entitled "Medical Assessment of Ability to Do Work Related Activities."  (Tr. 824-37).  He stated that he had been in medical practice for thirty-six years and had treated Plaintiff for twenty.  (Tr. 828).  He estimated that Plaintiff could occasionally carry ten to twenty pounds, could frequently carry five to ten pounds, could stand and walk for one hour without interruption, and could sit for one uninterrupted hour and four total hours during a workday.  (Tr. 825).  He indicated that Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl.  (Tr. 826).  He also said that Plaintiff's exposure to heights, moving machinery, chemicals, temperature extremes, vibration, dust noise, fumes, and humidity should all be restricted.  (Tr. 827).  He responded that Plaintiff did not have the residual functional capacity to do sedentary work.  (Tr. 828).  The questionnaire listed sixteen additional work-related activities involving social skills, mental and emotional capacity, and reliability.  Dr. Thomson indicated that it was not reasonably probable that Plaintiff was capable of functioning in any of these areas at any time since he last worked.  (Tr. 831-36).  Most interrogatories on the questionnaire asked the respondent to explain "yes" or "no" answers; Dr. Thomson declined to respond to these queries.

## III.    ADMINISTRATIVE REVIEW

A.     **Definition of "Disability" Under Social Security Act**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" as defined by the Social Security Act has a specialized meaning of limited scope. It encompasses those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. An applicant for Disability Insurance Benefits bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential evaluation answers five questions:

1.     Has the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix I?

4.      Considering the claimant's residual functional capacity, can she perform her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

20 C.F.R. § 404.1520(a)(4); *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).

### B.      ALJ McNichols' Decision on Remand

ALJ McNichols resolved Plaintiff's disability claim using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 398-411; *see also* 20 C.F.R. § 404.1520(a)(4).

The ALJ made a preliminary finding that Plaintiff "last met the Title II insured-status requirements of the Social Security Act on September 30, 2008," meaning that Plaintiff must prove that the disability he claims "commenced on or before" that date.  (Tr. 398).

At Step 1, the ALJ analyzed whether Plaintiff had engaged in substantial gainful work activity, involving "significant physical or mental" work that is performed "for pay or profit."  20 C.F.R. §§ 404.1520(b), 404.1572(a)-(b).  The ALJ found that Plaintiff had not been engaged in substantial gainful activity through the date last insured.  (Tr. 398).

At Step 2, the ALJ evaluated whether Plaintiff had a medically determinable impairment or combination of impairments qualifying as "severe" under 20 C.F.R. § 404.1520(c).  An impairment is severe if it "significantly limits [the claimant's] ability to

17

perform basic work activities." 20 C.F.R. § 404.1521(a).  In this case, the ALJ found that Plaintiff had the following severe impairments: "insulin-dependent diabetes mellitus, degenerative disc disease of the cervical and lumbar spine, residuals of right ankle fracture and corrective surgery including non-union and complications and depression." (Tr. 398).

At Step 3, the ALJ determined that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  (Tr. 405).

At Steps 4 and 5, the ALJ considered whether, in light of Plaintiff's residual functional capacity, he could perform either his past relevant work or any other work.  If so, he is not considered disabled.  20 C.F.R. § 404.1520(f)-(g).  The ALJ found that Plaintiff "had the residual functional capacity to perform sedentary work,"[4] with the following restrictions:

> no climbing ladders, ropes, scaffolding; no balancing; no exposure to hazards; the opportunity to alternate between sitting and standing at 30-minute intervals; no contact with the general public; no work on uneven surfaces; no use of foot controls on the right; no operation of motor vehicles; no duties that would preclude the use of an ambulatory aid (cane) when standing or walking; and essentially unskilled simply one- or two-step tasks (requiring little, if any, concentration).

(Tr. 406).  At Step 5, the ALJ found that a significant number of jobs that Plaintiff could perform existed in the national economy.  (Tr. 410-11).

---

[4] As defined by the Regulations, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

These determinations and their supporting evidence ultimately led the ALJ to find that Plaintiff was not disabled, and was accordingly not eligible to receive disability benefits.

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness of the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence support the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a

19

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    The Parties' Contentions

In this case, Plaintiff challenges the opinion of ALJ McNichols on two grounds. First, he argues that the ALJ erred in his Step 3 finding that Plaintiff's impairments do not meet or equal Listing 1.06 in 20 C.F.R. § 404, Subpt. P, App. 1.  (Doc. #7, PageID at 64-67).  Second, he contends that the ALJ erred in rejecting the opinion of Plaintiff's treating physician, Dr. Thomson, in favor of the opinion of a non-examining medical expert, Dr. Hutson.  (Doc. #7, PageID at 67-71).  The Commissioner responds that both of these conclusions by the ALJ were reasonable.

### B.    Listing 1.06

Listing 1.06 refers to "[f]racture of the femur, tibia, pelvis, or one or more of the tarsal bones," such that (1) "[s]olid union [is] not evident on appropriate medically acceptable imaging and not clinically solid"; and (2) the claimant has an "[i]nability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset."  § 404, Subpt. P, App. 1. 1.00B2b, in turn, defines "inability to ambulate effectively" as

20

an extreme limitation of the ability to walk; *i.e.* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

§ 404, Subpt. P, App. 1, 1.00B2b.

In his decision, ALJ McNichols wrote that Dr. Hutson had "specifically addressed"

the issue of which listings Plaintiff's impairments might meet or equal:

Dr. Hutson did not indicate in his responses to interrogatories that the severity of the claimant's documented impairments met or medically equaled the level of severity of any impairment . . . .  That conclusion is consistent with the medical record and is accepted as credible as it pertains to the claimant's condition through the date last insured.

(Tr. 405).

Plaintiff argues that he met Listing 1.06 since the surgeries on his leg and foot in

2004.  He believes Dr. Hutson's evaluation did not specifically address the Listing issue,

and, in any event, was based on a mistaken belief that the non-union would heal with

surgery.  (Doc. #7, PageID at 65).  He claims that he "needed to walk with a walker," but

21

used only a cane to avoid stigma. (*Id.*) He points to his occasional need to use an electric buggy at the grocery store, and his testimony that he cannot walk on uneven ground. (*Id.*) Even if he does not meet Listing 1.06, he contends, the numerous and persistent medical complications accompanying the non-union (pain and tenderness in his back, hip, and leg; nocturnal and resting paresthesias in his right hand; lumbar degenerative disease; lumbar radiculopathy down the right leg), should medically equal it. (Doc. #7, PageID at 66-67).

Although Plaintiff's lack of solid union in his right tibia is clear, he failed to prove that he is unable to "ambulate effectively," as provided by Regulations. 1.00B2b specifies that ineffective ambulation does not "permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Dr. Hutson emphasized that based on reports by his examining physicians, Plaintiff could actually ambulate "fairly well" with his cane. This assessment considered Plaintiff as he was, without additional surgery. This conclusion is consistent with the record. For example, Plaintiff testified that he "can walk a block comfortably . . . without having to sit down." (Tr. 366). Plaintiff also stated that he can drive, and was able to drive "a little over an hour" to the hearing held on April 4, 2007. (Tr. 367). Likewise, Dr. Magnusen noted during Plaintiff's follow-up visit regarding his ankle pain and swelling that Plaintiff "did some weed-whacking a few days ago . . . ." (Tr. 334). Plaintiff also does not present a contradictory medical opinion that he needs a walker (as opposed to a cane) and fails to meet his burden to prove he cannot "ambulate effectively."

22

Likewise, Plaintiff has not established that his impairments medically equal Listing 1.06.  ALJ McNichols relied on the opinion of Dr. Hutson as to whether Plaintiff's impairments medically equaled the requirements of the listing.  Dr. Hutson did not conclude that Plaintiff's impairments medically equaled the requirements of the listing, (Tr. 342), and Plaintiff did not present an alternative medical opinion, or otherwise demonstrate, that his impairments medically equal Listing 1.06.

Accordingly, substantial evidence supports ALJ McNichols' conclusion that Plaintiff's impairments do not meet or medically equal the requirements of Listing 1.06.

### C.      Respective Weights of Medical Opinions

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's opinion, rather than favoring the opinion of a nonexamining medical advisor.  *Blakley*, 581 F.3d at 406; *see Wilson*, 378 F.3d at 544. The rule applies if the treating physician's opinion is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record.  *Id.* An ALJ must "always give good reasons" for finding that this rule does not apply.  20 C.F.R. § 404.1527(c)(2).  If he or she supplies those reasons,

> the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.

*Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); 20 C.F.R. § 404.1527(c).

The Regulations make clear that the ALJ must apply these factors not only to treating physician opinions, but to any other medical opinions, including those accorded greater weight than a treating physician's opinion.  *See* 20 C.F.R. § 404.1527(e) (requiring the application of the factors to nonexamining sources, including state agency consultants and medical experts); *see also* Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

The Regulations also exclude from "medical opinion" any outside conclusions about whether and to what extent a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1527(d) reserves determinations about disability to the Commissioner, and declines to assign "special significance" to other sources of opinion on that question.

In this case, ALJ McNichols did not accord either controlling or deferential weight to the opinion of Plaintiff's treating physician, Dr. Thomson.  He wrote that Dr. Thomson's opinion that Plaintiff is "totally and permanently disabled"

> is neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record.  The extent of functional limitations described by Dr. Thomson is not supported by substantial objective medical evidence or clinical findings.  Furthermore, it is inconsistent with the findings of other examining and evaluating medical sources (Drs. Vitols and Hutson).  Clinical test results confirm the existence of impairments that would result in significant, but not necessarily "disabling," limitation. Statements contained in medical records support a conclusion that the claimant was capable of somewhat greater degree of functioning than indicated by Dr. Thomson through the date last insured. . . .   The conclusion of Dr. Thomson that the claimant was rendered totally and permanently disabled . . . cannot be considered credible.

(Tr. 402).

24

Plaintiff argues that this finding was in error on the grounds that Dr. Thomson's diagnoses were substantially supported by other medical opinions in the record. Defendant contends substantial evidence supports the ALJ's decision to reject Dr. Thomson's opinion and provide Dr. Hutson's opinion the most weight.  (*PageID#* 92).

Dr. Thomson has been in practice for 36 years and has treated Plaintiff for the past 20 years.  (Tr. 828).  Dr. Thomson wrote a letter addressed "To Whom it May Concern," regarding Plaintiff on March 23, 2007.  (Tr. 339).  In this letter, Dr. Thomson indicated that Plaintiff has the following medical issues: (1) motor vehicle accident 8/17/04 – multiple trauma; (2) crushed right leg with nonhealing (nonunion) right tibia; (3) compression fracture L5; (4) Chronic benign pain state secondary to #1, 2, & 3; (5) Narcotic dependence secondary to #1, 2, 3, & 4; (6) Insulin dependent diabetes mellitus; (7) Severe hyperlipidemia; (8) Elevated blood pressure; (9) Chronic recurrent pancreatitis; (10) Impotence secondary to all above; (11) Nicotine habit; (12) Chronic anxiety, depression; (13) Obesity with poor physical condition.  (Tr. 339).  Dr. Thomson opined that Plaintiff, due to "all outlined above . . . is obviously totally and permanently disabled."  (*Id.*).

Although Defendant is correct in noting that whether Plaintiff is "disabled" or "unable to work" is an issue "reserved to the Commissioner," *see* 20 C.F.R. § 404.1527(e), Dr. Thomson's opinion is nonetheless supported by the medical evidence of record and should not have been rejected.  For example, Dr. Magnusen reported on July 21, 2006 that "[t]here does appear to be a non-union of the distal tibia fracture," and that Plaintiff

experiences "[c]hronic pain in the right distal lower limb and foot." (Tr. 338). Dr.

Magnusen opined "[t]he pain appears to be both nociceptive and neuropathic," and that

"[t]here is obvious physical evidence of significant nerve and other soft tissue trauma in

addition to the above mentioned orthopedic injuries." (*Id.*). Dr. Magnusen also noted that

"[s]ensation is noted to be markedly impaired in the foot and ankle and is described as a

burning sensation." (*Id.*).

Even Dr. Vitols noted in his exam – conducted January 8, 2007 – that "[t]here is

global tenderness to the foot and the ankle," as well as "decreased ankle motion . . . and

decreased strength at 4/5 of the foot and ankle associated with pain." Dr. Vitols opined

that he reviewed x-rays, which "reveal plate and screw fixation both medially and

laterally," and that "[a] non-union and mal-union are evident in the distal tibia." (Tr. 315).

Dr. Vitols also reported, consistent with Dr. Thomson's opinion, that Plaintiff had: (1)

Mal-aligned, non-union distal third tibial fracture; (2) Status post Lisfranc foot fracture

right with chronic metatarsalgia; (3) Lumbosacral sprain and strain; (4) Exogenous

obesity; (5) Hypertension; and (6) Diabetes. (Tr. 315).

X-rays of Plaintiff's right lower leg – taken October 23, 2007 – likewise revealed

"chronic changes related to ORIF of the distal tibia and fibular fractures," as well as

"deformity and residual lucency at the original fracture site." (Tr. 655). Additional

evidence in the record further supports Dr. Thomson's diagnoses. For example, Dr. Bierer

saw Plaintiff on January 30, 2008, for an orthopedic consultation, and noted that he has

"Leg Pain. Nonunion distal tibia. Hardware irritation. Extraosseous bone formation." (Tr.

609).  Dr. Bierer noted that "[t]here does appear to be a screw backing out of the dorsum of [Plaintiff's] foot," and there is "[d]iffuse tenderness most pronounced in the medial aspect of the distal tibia and dorsum of the foot."  (*Id.*).

Despite such evidence in the record, the ALJ nonetheless concluded that Dr. Thomson's opinion "is neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record."  (Tr. 402).   After a thorough review of the record, however, it appears the only conflicting evidence relied upon by the ALJ consisted of the opinions of Drs. Vitol and Hutson.  Such reasoning, however, is insufficient.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.").   Moreover, Dr. Hutson appears only to have assessed Plaintiff's ability to work from an orthopedic standpoint, and does not appear to indicate that he – unlike Dr. Thomson – also considered pain management, obesity, or depression issues in arriving at his opinion that Plaintiff "can do no more than <u>sedentary</u> work at this time." (Underlining in original) (Tr. 340-42).

Accordingly, for the reasons discussed above, Plaintiff's argument is well taken.

## VI.   REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems previously identified.  On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) determine anew whether Plaintiff was under a disability and thus eligible for DIB during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Randall R. Morgan was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations; and,

4. The case be terminated on the docket of this Court.

July 23, 2013

____s/ Sharon L. Ovington_____
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).